UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILMY GARRIDO-VALDEZ,

               Petitioner,

    -vs-

THOMAS POOLE,

               Respondent.
_____

**AMENDED
DECISION AND ORDER**

No. 03-CV-6215

## INTRODUCTION

Petitioner Wilmy Garrido-Valdez ("Garrido-Valdez") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on one count of second degree murder in New York State Supreme Court (Monroe County). The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Maria Rivera ("Rivera"), Garrido-Valdez's wife, was fatally shot on January 13, 2000, at the couple's apartment on Jay Street in the City of Rochester. The following day, Garrido-Valdez turned himself in to the police and confessed to the murder. He was indicted on one count of intentional murder (N.Y. Penal Law § 125.25(1)) and one count of depraved indifference murder (N.Y. Penal Law §125.25(2)). He was tried before a jury in August 2000.

At trial, Garrido-Valdez's statement was offered by the prosecution and admitted into evidence. In it, Garrido-Valdez stated that he had become depressed because he and his wife had been having marital problems for quite some time. He purchased an automatic pistol on January

12, 2000, for the purpose of killing himself. The next night, Garrido-Valdez confronted Rivera with the pistol while she was talking on the phone. He told her that "since that is what she wanted, [him] out of her life, well, then, that is what [he] was going to do and that she was going to hear it." T.279.[1] According to Garrido-Valdez, Rivera then grabbed his arm, and in doing so, fell against the wall with the "pistol pointing around the area of her mouth." *Id.* Garrido-Valdez stated that he "had [his] finger on the trigger and the pistol fired," killing Rivera. *Id.* He claimed that he tried to shoot himself, but the gun malfunctioned. *Id.*

The jury returned a verdict convicting Garrido-Valdez of depraved indifference murder and acquitting him of intentional murder. He was sentenced to an indeterminate term of imprisonment of 25 years to life.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on November 15, 2002. *People v. Valdez*, 299 A.D.2d 858 (App. Div. 4th Dept. 2002). The New York Court of Appeals denied leave to appeal on February 3, 2003. *People v. Valdez*, 99 N.Y.2d 614 (N.Y. 2003). Garrido-Valdez filed no state court motions for collateral relief.

This habeas petition followed. All of the grounds for relief raised herein have been fully exhausted and are properly before this Court on habeas review. *See* 28 U.S.C. § 2254(b)(1); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995). For the reasons set forth below, the petition is denied.

## DISCUSSION

**Standard of Review**

---

[1] Citations to "T.__" refer to the trial transcript.

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**<u>Merits of the Petition</u>**

**Ground I:      Erroneous admission of audiotape**

Garrido-Valdez argues that the trial court erroneously allowed his voice to be identified from an incomprehensible audiotape of a voice mail message he allegedly made on the day of the murder. He contends that because the tape was inaudible, it caused prejudicial speculation on the jury's part regarding his motive to kill his wife.

On January 11, 2000, Jose Garcia ("Garcia"), an investigator with the Buffalo office of the Immigration and Naturalization Service ("INS"), received an anonymous phone call stating that an individual named "Maria" was illegally in the United States and was working as a dishwasher at a restaurant in Rochester. T.442-45. The following day, January 12, 2000, Garcia received an anonymous voice mail message from the same individual. Garcia recorded the voice mail message and eventually turned it over to the police. T.449.

The next day, January 13, 2000, Garcia received another phone call from the same individual. At first, the caller refused to identify himself. He stated that "Maria" was going to try to obtain a fake driver's license using another person's name and he urged Garcia to apprehend

her. Garcia replied that he could not do anything unless the caller identified himself, at which point the caller said that his name was Wilmy Valdez. The caller also supplied a date of birth and Social Security number that, according to the INS's file, matched those belonging to Garrido-Valdez. T.453.

At trial, the prosecution sought to introduce the audiotape of the voice mail message from January 12. The trial court partially sustained defense counsel's objection, ruling that because the audiotape was "not understandable" at all, it was inadmissible for its content. However, over defense counsel's further objection, the court allowed the audiotape to be introduced for the limited purpose of allowing Garcia to identify the caller's voice.  T.320-21. At trial, the prosecutor played the tape and Garcia testified that he recognized the voice as belonging to the person who had made the anonymous call on January 11 and had called again on January 13. T.450-51. The victim's sister, Carmen Rivera, also identified Garrido-Valdez's voice after listening to the tape of the voice mail message. Garcia only testified that the message stated that the caller "had a lot of traffic for [Garcia] that was information [defendant] had to give [Garcia], that [defendant] wanted to talk to [Garcia] the next day[.]" T.447.

On direct appeal, the state court held that the evidence was "properly admitted" for the "limited purpose of permitting a witness to identify defendant's voice on the audiotape[.]" *People v. Valdez*, 299 A.D.2d at 859 (citations omitted). It further found that, in any event, the "proof of defendant's guilt was overwhelming and there is no significant probability that defendant would have been acquitted absent the admission of the audiotape[.]" *Id.* (citations omitted). Thus, the court found, any error in admitting the tape was harmless[.]" *Id.* (citations omitted).

In conducting habeas review, this Court is limited to determining whether the petitioner's custody is in violation of federal law. *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.) (citing 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 119 (1982)), *cert. denied*, 525 U.S. 840 (1998). Due process requires that the state courts conduct criminal trials in a manner consistent with "'that fundamental fairness'" which is "'essential to the very concept of justice.'" *Id.* (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941) and citing *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)). Although it is contrary to both state and federal law to introduce "unfairly prejudicial evidence" against a defendant in a criminal trial, *id.* (citations omitted), "not all erroneous admissions of such evidence are errors of constitutional dimension." *id.* It is only when the improperly introduced evidence is "'so extremely unfair that its admission violates fundamental conceptions of justice'" that a due process violation results. *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Since the audiotape of the voice mail message was not introduced for its content, and the INS investigator did not testify as to the substance of the message, it appears that the trial court did not err as a matter of state law in allowing the limited admission of the tape. *Cf. People v. Bailey*, 12 A.D.3d 377, 786 N.Y.S.2d 181 (App. Div. 2d Dept. 2004) (At a trial where a tape of drug sale *was* admitted for its content, the court held that although portions of tape were inaudible, there was "no real danger" that the factfinder would be left to speculate as to what transpired in light of trained undercover police officers who provided eyewitness testimony regarding the transaction.) (emphasis supplied) (citing, *e.g.*, *People v. Harrell*, 187 A.D.2d 453, 589 N.Y.S.2d 531 (App. Div. 2d Dept. 1992) (In a case where an audiotape *was* sought to be

admitted for its content, the court held that an "audiotape recording should be excluded from evidence if it is so inaudible and indistinct that a jury must speculate as to its contents[.]") (emphasis supplied) (internal quotation marks omitted)). The Court believes that it would have been better practice for the trial judge to have issued a limiting instruction to the jury that it was not to consider or to speculate on the substance of what was said on the tape as proof in the case against defendant. However, the failure to give a limiting instruction was mitigated by the fact that the prosecutor announced, just prior to playing the tape, that the tape was being moved into evidence "for the purposes of identifying the voice [on the tape], not with respect to the words that are spoken on the tape." T.455-56. Thus, the jury was on notice that the contents of the audiotape were not to be used as evidence.

      Moreover, the evidence was not "unfairly prejudicial" to Garrido-Valdez such that his constitutional right to a fundamentally fair trial was impaired. Garrido-Valdez argues that the jury may have speculated that the tape contained evidence that he planned his wife's demise–that when his efforts to have her deported failed, he killed her instead. However, the jury already had evidence before it that Garrido-Valdez's efforts to have his wife deported were not going to come to fruition, at least not in the short term: Garcia, the INS investigator, testified that he told Garrido-Valdez that he could not pursue the matter further until he personally met with Garrido-Valdez the following week and confirmed the allegations against "Maria." T.452-54. The foregoing conversation occurred on January 13, and "Maria" was killed later that night. Arguably, the jury did not have to resort to speculation about the contents of the tape since this properly admitted testimony was circumstantial evidence from which the jury could make inferences regarding Garrido-Valdez's motives. In the context of the compelling evidence against

Garrido-Valdez, the limited introduction of the audiotape was not "unfairly prejudicial." As Garrido-Valdez cannot show that a constitutional violation resulted from the trial court's ruling, this claim does not present a basis for habeas relief.

**Ground II:    Denial of right to trial by impartial jury**

Garrido-Valdez challenges the seating of Juror No. 9 and Juror No. 13 on the basis that they had "significant biases" that precluded them from being fair and impartial. On direct appeal, the Appellate Division held that "[a]lthough those prospective jurors initially expressed views casting doubt on their ability to be impartial in this case, they each ultimately stated unequivocally that they could be fair[.]" *People v. Valdez*, 299 A.D.2d at 859 (citation omitted).

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). The defendant claiming that biased jurors were seated on his jury bears the burden of showing prejudice–that is, the "actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Irvin*, 366 U.S. at 723 (internal quotations and citations omitted); *accord, e.g.*, *Murphy v. Florida*, 421 U.S. 794, 800 (1975). The Supreme Court has held that the question of whether jurors have opinions that disqualify them is one of historical fact to which the habeas statute's presumption of correctness[2] applies. *Patton v. Yount*, 467 U.S. 1025, 1037-38 (1984) (citing, *e.g.*, *Rushen v. Spain*, 464 U.S.

---

[2] At the time that *Yount* was decided, the presumption of correctness to be applied in habeas corpus proceedings was codified at 28 U.S.C. § 2254(d). Since the habeas statute was amended in 1996, the presumption has been set forth at 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

114, 120, (1983) (state-court determination that juror's deliberations were not biased by *ex parte* communications is a finding of fact)). Furthermore, a federal court sitting in habeas review is not permitted to redetermine the state trial court's factual findings regarding the credibility of jurors whose demeanor has been observed by the trial court–and not by the habeas court–and must more than simply disagree with the state court in order to reach a different result. *Yount*, 467 U.S. at 1037 (stating that because "the determination is essentially one of credibility, and therefore largely one of demeanor[,] . . . the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference'") (citing *Marshall v. Lonberger*, 459 U.S. 422, 433-35 (1983) (habeas court must conclude that trial court's credibility findings "lacked even 'fair[ ] support' in the record") (in turn quoting *Sumner v. Mata*, 455 U.S. 591 (1982) (alteration in original)). Thus, the "trial court's findings of juror impartiality may 'be overturned only for "manifest error."'" *Mu'Min v. Virginia*, 500 U.S. 415, 428-29 (1991) (quoting *Yount*, 467 U.S. at 1031 (1984) (in turn quoting *Irvin*, 366 U.S. at 723)). In other words, the question for the habeas court is "whether there is fair support in the record" for the state court's conclusion that the challenged jurors would be impartial. *Yount*, 467 U.S. at 1038.

As the state appellate court found, during the initial voir dire by defense counsel, both Juror No. 9 and Juror No. 13 expressed some hesitation about their respective abilities to be impartial. Later questioning resulted in the jurors providing the following assurances regarding their competence to serve:

| | |
|---|---|
| The Court: | I want to clarify our conversation. Can you be a fair and impartial juror? |
| Juror No. 9: | I think I can be. Otherwise I wouldn't have been here this morning. |
| The Court: | I need a yes. |

|                  |                                                                                                                                                                              |
|------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Juror No. 9:     | Yes, I think I can be.                                                                                                                                                       |
| Defense Counsel: | I think if she is going to say something she told her true feelings. Yes, she can be.                                                                                        |
| The Court:       | My last question, if you were the Defendant on trial having your state of mind would you want yourself to sit as a juror?                                                    |
| Juror No. 9:     | Yes.                                                                                                                                                                         |
| The Court:       | So, you think you can be fair and impartial?                                                                                                                                 |
| Juror No. 9:     | I think – I know I will.                                                                                                                                                     |
| The Court:       | You think you can?                                                                                                                                                           |
| Juror No. 9:     | You can dismiss me if you are weeding through all those. Obviously you feel I am not qualified to do that then.                                                              |
| The Court:       | We want an assurance from you.                                                                                                                                               |
| Juror No. 9:     | But you asked me if I though I was sure.                                                                                                                                     |
| The Prosecutor:  | The language is something unusual for a juror. That is why you had to be called back. No one questions what you are saying.                                                  |
| The Court:       | We have to account to higher courts.                                                                                                                                         |
| Juror No. 9:     | I appreciate that.                                                                                                                                                           |
| . . .            |                                                                                                                                                                              |
| The Court:       | Can you be a fair and impartial juror?                                                                                                                                       |
| Juror No. 13:    | Yes.                                                                                                                                                                         |
| Defense Counsel: | When we were questioning you in the box you were a little hesitant about it. You weren't sure and I didn't want you to say yes.                                              |
| Juror No. 13:    | I was just hesitant because I know I have a bit of a background with guns I guess. But I don't think it is going to change my role as a juror.                               |
| The Court:       | Can you keep an open mind until the end of this trial?                                                                                                                       |
| Juror No. 13:    | Yes.                                                                                                                                                                         |

T.140-42.

Here, the trial court concluded, after extensive questioning, that the jurors challenged for cause were competent to serve. Juror No. 9, in response to the court's question, "[Y]ou *think* you can be fair and impartial?", stated: "I think – I *know* I will." T.140. The comments that followed this exchange do not negate the fact that Juror No. 9's assurance, taken in context and as a whole, was unequivocal. As to Juror No. 13, the trial court secured a definite statement that she would

keep an open mind until the end of the trial. *See* T.141-42. After reviewing the voir dire of these jurors, the Court cannot say that the state trial court's conclusion regarding their ability to be impartial is without "fair support" in the record. *See Patton*, 467 U.S. at 1038. Furthermore, Garrido-Valdez must rebut the presumption of correctness accorded to the state trial court's factual determinations of impartiality by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Garrido-Valdez, however, has not presented any evidence other than the voir dire testimony of Juror No. 9 and Juror No. 13 in support of his argument that these two individuals were incapable of being impartial. Thus, in holding that "[a]lthough [the two] prospective jurors initially expressed views casting doubt on their ability to be impartial in this case, they each ultimately stated unequivocally that they could be fair," the state appellate court did not unreasonably apply clearly established federal law. *See Patton v. Yount*, 467 U.S. at 1040. (holding that "the ambiguity in the testimony of the cited jurors who were challenged for cause [wa]s insufficient to overcome the presumption of correctness owed to the trial court's findings").[3] Habeas relief is not warranted on this claim.

**Ground III: Harsh and excessive sentence**

A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548

---

[3] In this Court's opinion, the jurors challenged for cause in *Patton* showed considerably more ambiguity than did the allegedly biased jurors at Garrido-Valdez's trial. The first juror in *Patton* used the word "think" in giving his "assurance" of impartiality: "I think I could enter it [the jury box] with a very open mind. I think I could . . . very easily. To say this is a requirement for some of the things you have to do every day." 467 U.S. at 1039. As to the second juror in *Patton*, the trial judge credited her earliest testimony, in which she said that she could put her opinion aside "[i]f [she] had to," rather than her later testimony in which "defense counsel persuaded her that logically she would need evidence to discard any opinion she might have." *Id.* at 1039-40. The Supreme Court did not find that to be "manifest error." Finally, the Supreme Court deferred to the trial court's credibility assessment of the third challenged juror who was the "most ambiguous," seeming to have "answered 'yes' to almost any question put to him." *Id.* at 1040.

F.2d 1102, 1109 (2d Cir. 1977) (holding that petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports) (citing *Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus.")). A challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).

Garrido-Valdez was convicted of second degree murder pursuant to New York Penal Law § 125.25(2), a class A-1 felony which carries a sentencing range of a minimum of 15 years and a maximum of 25 years to life. Because Garrido-Valdez's sentence of 25 years to life was within the statutory range, he has presented no constitutional claim for habeas review.

**Ground IV:   Invalid waiver of right to counsel**

Garrido-Valdez contends that he did not effectively waive his Sixth Amendment right to counsel because Officer Evelyn Baez ("Baez"), who conducted the interview of him which resulted in his making a written statement, spoke to him partially in Spanish and partially in English. Garrido-Valdez argues that it is therefore "questionable whether he understood that he was entitled to an attorney" prior to making an inculpatory statement to the police. On direct appeal, the state court held that the evidence at the suppression hearing "establishe[d] that [the defendant] knowingly and intelligently waived his right to counsel after receiving *Miranda*[4] warnings in Spanish and prior to making his statement to the police." *People v. Valdez*, 299 A.D.2d at 859.

---

[4]   *Miranda v. Arizona*, 384 U.S. 436 (1966).

On at about 9:00 a.m. on, Garrido-Valdez walked into the City of Rochester's Lyell Avenue Neighborhood Empowerment Team ("NET") office[5] and announced that he had killed his wife on Jay Street the night before. Garrido-Valdez addressed employees Joe Lake ("Lake"), Linda Vazquez ("Vazquez") and Arleen Hyland ("Hyland"), and he spoke in both English and Spanish. Garrido-Valdez turned over a pistol to Lake, who then called 911. Officer John Newcomb ("Newcomb") responded to the NET office. Because Newcomb did not speak any Spanish, Newcomb asked Hyland, who was fluent in Spanish, to ask Garrido-Valdez if he had any other weapons on him and to get into the police car.

Newcomb related that he did not ask Garrido-Valdez any questions during the drive to the police station, but that Garrido-Valdez spontaneously stated, "I never have no problem. I never have no problem. Big problem now." Garrido-Valdez did not make any other statements to Newcomb. Newcomb testified that he did not read the *Miranda* warnings to Garrido-Valdez. Once at the police station, Newcomb brought Garrido-Valdez to Officer Ronald Reinstein ("Reinstein"). Reinstein testified that he asked Garrido-Valdez if he were more comfortable speaking English or Spanish, and Garrido-Valdez replied that "he didn't feel that his English was that good." Reinstein then asked Officer Evelyn Baez ("Baez") to conduct the interview because she was fluent in Spanish (Baez, a native of Puerto Rico, spoke Spanish as her first language).

According to Baez's testimony at the suppression hearing and at trial, Garrido-Valdez did not appear to be ill or injured or under the influence of any drugs or alcohol. Baez testified that

---

[5] The NET office is affiliated with the City of Rochester Police Department, and some of the employees who work there are employed by the police department. However, neither Lake, Hyland, nor Vazquez, the only NET employees with whom Garrido-Valdez spoke, were employed by the police department. Rather, they were employed by the City of Rochester. There were no police officers in the NET office at the time that Garrido-Valdez came in and announced that he had killed his wife.

after introducing herself to Garrido-Valdez, she briefly spoke to him in Spanish to determine his level of comprehension. Garrido-Valdez told her that he had attended university in Santo Domingo but had not completed his degree. He stated that he "knew enough English to defend himself in the streets but that he would prefer if [they] spoke to him in Spanish." H2.34,[6] T.247. Baez then advised Garrido-Valdez, in Spanish, of his rights. H2.36-37, T.249-51. According to Baez, Garrido-Valdez interrupted her, in Spanish, at the word "silent" and said that he wanted to talk about what had happened on Jay Street. H2.37, T.249. Baez asked him to let her finish. When she got to the word "used," Garrido-Valdez interjected, "[I]t can be used for or against me in a court of law." H2.37, T.250. Again, Baez asked him to let her finish. When she said the word "lawyer," Garrido-Valdez said, "I don't want a lawyer, I want to talk to you about what happened. H2.37, T.250. After she finished reading the warnings, Baez asked Garrido-Valdez if he understood his rights. Garrido-Valdez responded that he understood his rights and wanted to talk to the police. H2.38, T.250.

Here, it is undisputed that Garrido-Valdez was in custody when he gave his statement to Baez.[7] The issues then are whether Baez properly informed Garrido-Valdez of the *Miranda* warnings and whether Garrido-Valdez knowingly, intelligently and voluntarily waived his right to counsel. *Miranda* does not require any kind of "talismanic incantation" in order to satisfy its procedural safeguards. *California v. Prysock*, 453 U.S. 355, 359 (1981). That is, the police need not recite the *Miranda* opinion verbatim, but the words used should be the "'fully effective

---

[6] Citations to "H2.__" refer to the second day's transcript of the suppression hearing.

[7] Garrido-Valdez does not argue that his statements to the NET office employees or to Newcomb should have been suppressed.

equivalent'" of the *Miranda* warnings. *Id.* (quoting *Miranda*, 384 U.S. at 476 and citing *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980)).

Garrido-Valdez's claim that Baez issued the *Miranda* warnings partially in Spanish and partially in English is contradicted by Baez's testimony at the hearing and at trial that she read the *Miranda* warnings entirely in Spanish and that she responded to all of Garrido-Valdez's interruptions in Spanish. *See* H2.36-39, T.246-52. Furthermore, Garrido-Valdez's claim that he did not understand the warnings read to him is belied by the comments he made to Baez on the occasions that he interrupted her. Contrary to his assertions, Garrido-Valdez appears to have clearly understood the substance of the *Miranda* warnings. When Baez informed him that he had the right to a lawyer, he interrupted her and very explicitly declined the services of an attorney. Garrido-Valdez willingly agreed to talk to the police without counsel present; in fact, his comments throughout Baez's attempt to issue the *Miranda* warnings suggest that he was eager to tell his side of the story.

Garrido-Valdez cannot overcome the presumption of correctness that must be accorded to the state court's findings of fact. *See* 28 U.S.C. § 2254(e)(1). To the contrary, the evidence adduced at the suppression hearing and at trial establishes that Garrido-Valdez understood the warnings as given, indicated his understanding of them, and waived his right to have counsel present during his interrogation. Accordingly, habeas relief is not warranted on this claim.

**Ground V: Failure to issue missing witness jury instruction**

Garrido-Valdez argues that the trial court erred in failing to issue a missing witness jury instruction with respect to the victim's mother. He contends that she should have been called to testify because she "was present at the house on said day and was the first person to arrive upon

the body of the decedent." On appeal, the state court rejected this on the basis that the request, made after the close of the proof, was untimely.

The adequacy of a court's instructions to a jury is normally a matter of state law. *See Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Since habeas relief requires the petitioner to predicate his claims on a violation of the federal constitution, *e.g.*, 28 U.S.C. § 2254(a), Garrido-Valdez must show that the trial court's failure to give certain jury instructions violated some right which was guaranteed to him by the Fourteenth Amendment, *see Cupp*, 414 U.S. at 146. It is not sufficient to simply show that the court's omission in instructing the jury was erroneous deficient under state law.

New York law requires the party seeking the missing witness charge to establish "that the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case; that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him; and that the witness is available to such party." *People v. Gonzalez*, 68 N.Y.2d 424, 427 (1986); *accord, e.g., People v. Macana*, 84 N.Y.2d 173 (1991). Here, Garrido-Valdez provides no particulars as to what the victim's mother's testimony would have been. He merely asserts that she was present in the house on the day of the murder. Because he has not shown that the uncalled witness had knowledge concerning an issue material to his defense or that she would have testified favorably for him, he cannot show that the trial court erred in refusing to give the missing witness charge. Without a showing of how he was prejudiced by the court's failure to issue the instruction, Garrido-Valdez cannot establish that his trial was rendered fundamentally unfair. This is fatal to his ability to show a violation of his constitutional rights. Thus, Garrido-Valdez cannot obtain habeas relief on this claim.

## CONCLUSION

For the reasons stated above, Wilmy Garrido-Valdez's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Garrido-Valdez has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:   August 31, 2005
         Rochester, New York.